UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NEW YORK TIMES COMPANY and JOHN T. EWING, JR., | |
| Plaintiffs, | |
| -v.- | 19 Civ. 1424 (KPF) |
| UNITED STATES DEPARTMENT OF JUSTICE, | **OPINION AND ORDER** |
| Defendant, | |
| VOLKSWAGEN AG, | |
| Intervenor. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs The New York Times Company and John T. Ewing, Jr., a reporter for The New York Times, bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against Defendant U.S. Department of Justice ("DOJ"). Plaintiffs seek documents relating to DOJ's supervision of Intervenor Volkswagen AG's ("VW") compliance with a 2018 plea agreement (the "Plea Agreement") arising out of VW's scheme to evade emissions requirements. Plaintiffs narrowed their request to a single report and associated appendices (collectively, the "Report") produced by the independent monitor (the "Monitor") tasked with overseeing VW's compliance with the Plea Agreement. Defendant disclosed a limited portion of the Report on October 1, 2019, and, after the monitorship ended on September 14, 2020, provided Plaintiffs with a heavily redacted copy of the Report on November 25, 2020. The parties dispute Defendant's withholding of the remainder of the Report. Now that the parties

have had an opportunity to refine the issues, Defendant and Intervenor have moved for summary judgment, and Plaintiffs have cross-moved for summary judgment.  For the reasons that follow, Defendant's motion is denied; Intervenor's motion is denied; and Plaintiffs' motion is denied.  However, the Court orders Defendant to produce an unredacted copy of the Report for *in camera* review.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   VW's Conduct and Plea Agreement

On January 11, 2017, in the United States District Court for the Eastern District of Michigan, Intervenor VW was charged with and agreed to plead

---

[1]   This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), and from the parties' submissions in relation to the instant motions.  Those submissions include the first Declaration of Jennifer L. Blackwell ("1st Blackwell Decl." (Dkt. #28)); the Declaration of Michael A. Sullivan ("Sullivan Decl." (Dkt. #29)); the Declaration of Suhana S. Han ("Han Decl." (Dkt. #32)); the Declaration of David E. McCraw ("McCraw Decl." (Dkt. #35)); and the Supplemental Declaration of Jennifer L. Blackwell ("2d Blackwell Decl." (Dkt. #58)); as well as the exhibits attached to those declarations.  For convenience, the plea agreement between VW and the United States is referred to as the "Plea Agreement" (1st Blackwell Decl., Ex. 1); the redacted copy of the Monitor's Report produced to Plaintiffs on November 25, 2020, is referred to as the "Redacted Report" (2d Blackwell Decl., Ex. A); and the Declaration of Thomas Meiers in Support of Intervenor's Motion for Summary Judgment is referred to as "Meiers Decl." (Han Decl., Ex. F).

For ease of reference, the Court refers to the parties' briefing as follows:  Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment as "Def. Br." (Dkt. #27); Intervenor's Memorandum of Law in Support of Intervenor's Motion for Summary Judgment as "VW Br." (Dkt. #31); Plaintiffs' Memorandum of Law in Opposition to Defendant and Intervenor's Motions for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment as "Pl. Br." (Dkt. #36); Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment as "Def. Reply" (Dkt. #42); Intervenor's Reply Memorandum of Law in Further Support of Intervenor's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment as "VW Reply" (Dkt. #41); and Plaintiffs' Reply Brief in Further Support of Plaintiffs' Cross-Motion for Summary Judgment as "Pl. Reply" (Dkt. #43).  Additionally, Defendant's Supplemental Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment is referred to as "Def. Supp. Br." (Dkt.

guilty to conspiracy to defraud the United States, to commit wire fraud, and to violate the Clean Air Act; obstruction of justice; and entry of goods by false statement.  (Plea Agreement ¶ 1).  *See generally United States* v. *Volkswagen*, No. 16 Cr. 20394 (SFC) (APP) (E.D. Mich. March 10, 2017).  These charges arose from VW's use of cheating software to evade emissions requirements applicable to certain of VW's diesel vehicles.  (1st Blackwell Decl. ¶ 3; *see also* Plea Agreement, Ex. 2 ("Statement of Facts")).  DOJ and VW entered into the Plea Agreement on March 10, 2017, when VW pleaded guilty.  (1st Blackwell Decl. ¶ 5).[2]  On April 21, 2017, at sentencing, a district judge in the United States District Court for the Eastern District of Michigan accepted the Plea Agreement and sentenced VW principally to a term of three years' organizational probation on the criminal charges.  (*Id.* at ¶ 6).

The Plea Agreement required VW to, *inter alia*, pay a $2.8 billion criminal penalty, retain an independent compliance monitor to oversee the company under specified conditions for at least three years, and fully cooperate in the ongoing investigation and prosecution arising out of and related to VW's criminal activity.  (1st Blackwell Decl. ¶ 5; *see also* Plea Agreement ¶¶ 3, 6, 7).  If VW violated the Plea Agreement — including by providing "deliberately false,

---

#57), and Plaintiffs' Supplemental Memorandum of Law in Further Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment is referred to as "Pl. Supp. Br." (Dkt. #59).

[2]      Because the Plea Agreement was entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the district court had the discretion to accept or reject the Agreement, including in particular its agreed-upon sentence.  At the plea proceeding, the district court deferred acceptance until the sentencing proceeding the following month.

incomplete, or misleading information" or by failing to "implement a compliance program as set forth in the [Plea] Agreement" — the Plea Agreement provided that VW "shall thereafter be subject to prosecution."  (Plea Agreement ¶ 9(A)). Specifically, the Plea Agreement stated that "[d]etermination of whether [VW] has breached the Agreement and whether to pursue prosecution of [VW] shall be in [DOJ's] sole discretion."  (*Id.*).

### 2.    The Independent Monitorship

Of significance here, the Plea Agreement required that VW retain an independent monitor for a period of three years.  (Plea Agreement, Ex. 3 at ¶ 1). The Monitor's mandate included the responsibility to "assess, oversee, and monitor [VW's] compliance with the terms of the [Plea] Agreement, so as to specifically address and reduce the risk of any recurrence of [VW's] misconduct[.]"  (*Id.*, Ex. 3 at ¶ 2).

The Monitor's duties included the production of several reports and work plans.  (*See* Plea Agreement, Ex. 3 at ¶¶ 10-19).  One such report is referred to in the Plea Agreement as an "initial review," which "set[s] forth the Monitor's assessment and, if necessary, mak[es] recommendations reasonably designed to improve the effectiveness of the [VW's] program for ensuring compliance[.]" (*Id.*, Ex. 3 at ¶ 12).  VW was generally required to "adopt and implement" all of the Monitor's recommendations within 150 days of receiving the initial review (*id.*, Ex. 3 at ¶ 13), and DOJ stated that it could "consider the Monitor's recommendation and [VW's] reasons for not adopting the recommendation in determining whether [VW] has fully complied with its obligations under the

[Plea] Agreement" (*id.*, Ex. 3 at ¶ 14).  The Monitor was further tasked with submitting "follow-up reviews" that similarly assessed VW's compliance program and made recommendations that VW was generally obligated to adopt. (*Id.*, Ex. 3 at ¶¶ 16-19).  DOJ could also consider VW's failure to adopt these recommendations in determining whether VW was in compliance with its obligations under the Plea Agreement.  (*Id.*).  Near the end of the Monitor's term, "the Monitor shall certify whether [VW's] compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-fraud and environmental laws." (*Id.*, Ex. 3 at ¶ 19).  The Monitor was also obligated to report certain potential misconduct directly to DOJ.  (*Id.*, Ex. 3 at ¶ 20(b)).

The Plea Agreement incorporated a provision specifying that the Monitor's reports "are intended to remain and shall remain non-public, ... except to the extent [DOJ] determine[s] in [its] sole discretion that disclosure would be in furtherance of [DOJ's] discharge of [its] duties and responsibilities or is otherwise required by law." (Plea Agreement, Ex. 3 at ¶ 23).  One reason enumerated in the Plea Agreement for this confidentiality provision is that "public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations[.]" (*Id.*).  Additionally, "[a]t the outset of the monitorship, [VW] and the Monitor entered into a non-disclosure agreement" that restricted the use of items designated as "protected information" for use "only in connection with the monitorship and for no other purpose." (Meiers Decl. ¶ 9).

5

Pursuant to the Plea Agreement, VW proposed three candidates for Monitor, from whom DOJ chose former Deputy Attorney General Larry D. Thompson.  (Plea Agreement ¶ 15; 1st Blackwell Decl. ¶ 6).[3]  To ensure that the Monitor and his team had access to the information and personnel at VW necessary to carry out his work, while protecting sensitive commercial information, VW formed a project management office ("PMO") to serve as the Monitor's liaison within VW.  (Meiers Decl. ¶¶ 8-9).  Among other tasks, the PMO "collect[ed] and review[ed] each document requested by the Monitor to ensure that [VW's] confidential and privileged information [was] protected."  (*Id.* at ¶ 9).

The Monitor's initial report was delivered to DOJ on March 30, 2018. (1st Blackwell Decl. ¶ 23).  It covered the Monitor's initial period of review, beginning in October 2017.  (Meiers Decl. ¶ 10).  The Report consists of nine substantive sections totaling 129 pages, supported by 27 pages of footnotes, and includes five appendices totaling 44 pages.  (2d Blackwell Decl. ¶ 16; *see also* Redacted Report).  The Report "describes the Monitor's extensive interviews, meetings, and review of company policies and focuses on the Monitor's list of recommendations and observations regarding the VW

---

[3]     Mr. Thompson also serves as the "Independent Compliance Auditor" for VW under a Third Partial Consent Decree that VW entered into with DOJ, and under a Third Partial Consent Decree that VW entered into with the State of California to resolve civil claims related to the same conduct.  (*See* Sullivan Decl. ¶ 1(b); Meiers Decl. ¶ 7; Han Decl., Ex. H-I).  *See also* Third Partial Consent Decree, *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672 (N.D. Cal. Apr. 13, 2017).  While the parties contemplated that the Monitor's reports would be confidential pursuant to the terms of the Plea Agreement (*see* Plea Agreement, Ex. 3 at ¶ 23), the reports published by the Monitor pursuant to the Third Partial Consent Decrees are to be made public (*see* Sullivan Decl. ¶ 5; Meiers Decl. ¶ 12 & n.7).

compliance program." (1st Blackwell Decl. ¶ 25). According to VW, these "detailed findings, observations, and ... recommendations" relate to VW's "global compliance systems and processes, technical development, and environmental compliance initiatives." (Meiers Decl. ¶ 11). The Report is "replete with details" about, *inter alia*, VW's "compliance programs at the onset of the monitorship, the Monitor's activities during the initial review, the company's remediation of its compliance programs, VW's disciplinary process, the Monitor's observations about corporate matters that could affect compliance, and the Monitor's recommendations for corporate change." (1st Blackwell Decl. ¶ 25). In addition to non-binding findings and observations, the report contains 32 recommendations that, as discussed above, VW was generally obligated to adopt. (Meiers Decl. ¶ 11).

After the Monitor delivered the Report, DOJ stakeholders "discussed internally and with the Monitor" in order to assess "whether VW was on track to meet its obligations, what additional information [DOJ] would need to determine whether [VW] had done so, and whether [DOJ] needed to take any additional steps or measures to ensure VW's continued progress under the Plea Agreement." (1st Blackwell Decl. ¶ 30). DOJ considered the Report's "recommendations and advice" in "deciding whether further actions [were] needed under the Plea Agreement," including "whether and to what extent [DOJ] would need to consider extending the term of the monitorship," and "whether VW [was] in breach with the obligations related to its retention of the Monitor and implementation of an effective compliance plan." (*Id.* at

¶¶ 28, 30).  On September 14, 2020, after briefing on the instant motions was complete, the Monitor's term ended.  (*See* Dkt. #49; *see also* 1st Blackwell Decl. ¶ 31; 2d Blackwell Decl. ¶ 6).

### 3.    Plaintiffs' FOIA Request

On December 10, 2018, Plaintiffs submitted a FOIA request to DOJ's Environment and Natural Resources Division ("ENRD").  (Compl. 8)  The request sought:

> [i] A copy of all reports submitted to the [DOJ] by the Monitor under the plea agreement in *United States* v. *Volkswagen,* No. 16-CR-20394 (E.D. Mich.) and the Independent Compliance Auditor under [*In re*] *Volkswagen "Clean Diesel,"* No. MDL 2672 (N.D. Cal.)[,] and

> [ii] A copy of all 'factual evidence' presented by Jones Day to the [DOJ] as the term is used on page 295 of [VW's] 2017 annual report.  Of particular relevance are documents related to the involvement of members of [VW's] executive board or supervisory board in the events described in the Statement of Facts [that is attached to the] [P]lea [A]greement.

(*Id.*).  After ENRD failed to respond for several months, Plaintiffs initiated the instant litigation on February 14, 2019, seeking to compel Defendant to produce documents responsive their requests.  (*See generally* Compl.).

By letter dated August 9, 2019, Plaintiffs and Defendant informed the Court that Defendant had issued a final response to Plaintiffs' FOIA request, and that the parties had subsequently narrowed the records at issue in the present action to the Monitor's March 30, 2018 initial report and appendices. (Dkt. #10).  On October 1, 2019, Defendant released a short section of the Report entitled "The Monitorship," which section primarily contains publicly

available information taken from the Plea Agreement and the California consent decrees.  (McCraw Decl., Ex. 1; *see also* 1st Blackwell Decl. ¶¶ 39-41).

Defendant withheld the remainder of the Report in its entirety, arguing that FOIA Exemptions 4, 5, 6, 7(A), and 7(C) applied.  (Def. Br. 1).[4] Specifically, Defendant asserted that the Report contained the Monitor's "candid assessment of VW's operations and compliance efforts, based on an extensive review of information from and about VW, much of which is confidential," and that "[d]isclosure of an independent monitor's report — before the monitor's term is complete — would reduce the monitor's effectiveness and ultimately harm DOJ's ability to prevent corporate recidivism."  (*Id.*).  Defendant noted that disclosure of the Report would "harm the Monitor's ability to gather candid, accurate, and complete information from VW and its employees and hurt his ability to assess VW's compliance with the Plea Agreement."  (*Id.*).  Defendant further explained that it "relied on the Report in making a series of decisions related to VW's compliance with the Plea Agreement."  (*Id.*).  Plaintiffs disputed that DOJ could withhold the remainder of the report for these reasons, explaining that disclosure of the report is

---

[4]     Exemption 4 prevents disclosure of records that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4); Exemption 5 prevents from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," *id.* § 552(b)(5); Exemptions 6 and 7(C) generally prevent disclosure of records or information that contain certain personal information implicating the privacy interests of individuals, *see* 5 U.S.C. § 552(b)(6), (7)(C); and as relevant here, Exemption 7(A) "protects from disclosure 'records or information' compiled for law enforcement purposes, the production of which 'could reasonably be expected to interfere with enforcement proceedings.'"  *Tipograph* v. *U.S. Dep't of Justice*, 83 F. Supp. 3d 234, 239 (D.D.C. 2015) (quoting 5 U.S.C. § 552(b)(7)(A)).

crucial for the public to "assess[] whether VW has indeed left its cheating past behind." (Pl. Br. 1).

## B.    Procedural Background

As mentioned above, Plaintiffs filed their Complaint in this action on February 14, 2019. (Dkt. #1). By Order dated August 9, 2019, the Court endorsed a joint letter setting a schedule for briefing the parties' anticipated cross-motions for summary judgement. (Dkt. #11). On September 16, 2019, the parties requested an extension of the briefing schedule to allow VW to intervene in the case. (Dkt. #14). That same day, the Court granted the parties' request and approved their proposed schedule to file cross-motions for summary judgment. (Dkt. #15). On September 24, 2019, VW filed an unopposed motion to intervene (Dkt. #16-19), which the Court granted on September 25, 2019 (Dkt. #25).

On October 18, 2019, Defendant moved for summary judgment; on October 21, 2019, Intervenor moved for summary judgment; and on November 15, 2019, Plaintiffs cross-moved for summary judgment or, in the alternative, for *in camera* review of the Report. (Dkt. #26-32, 34-36). On December 6, 2019, Defendant and Intervenor filed their reply memoranda of law in further support of their motions for summary judgment, and on December 19, 2019, Plaintiffs filed their reply in further support of their motion for summary judgment. (Dkt. #41-43).

Defendant's submissions in support of its motion for summary judgment stated that the monitorship was to end on September 14, 2020. (*See* 1st

10

Blackwell Decl. ¶ 31).  Accordingly, on September 24, 2020, the Court directed to parties to file letters confirming whether the monitorship had in fact ended. (Dkt. #46).  The Court also ordered the parties to state their positions on the impact of such termination on the pending cross-motions for summary judgment.  (*Id.*).  In response, Defendant confirmed that the monitorship had ended on September 14, 2020; explained that Defendant no longer withheld portions of the Report under FOIA Exemption 7(A); and asserted that the remainder of the Report was still properly withheld in full pursuant to Exemption 5 and in part pursuant to Exemptions 4, 6, and 7(C).  (*See* Dkt. #49).  Given that a significant portion of Defendant's initial briefing in support of its motion for summary judgment had argued that Exemption 7(A) applied to the Report, Defendant suggested that the Court might benefit from supplemental briefing on the pertinence of the other purportedly applicable FOIA exemptions.  (*See id.*).  Accordingly, on October 2, 2020, the Court ordered Plaintiffs and Defendant to submit supplemental briefing on the applicability of Exemptions 4 and 5, noting that the parties did not dispute the applicability of Exemptions 6 and 7(C) to limited portions of the Report.  (Dkt. #52).[5]

On October 29, 2020, Defendant requested an extension of the supplemental briefing schedule in order to conduct another segregability analysis of the Report to determine whether it contained additional material

---

[5]     Because Intervenor did not address Exemption 7(A) in any depth in its briefing on the parties' cross-motions for summary judgment (*see* Dkt. #30-32, 41), the Court did not grant Intervenor leave to file supplemental briefing (Dkt. #52).

that could be reasonably segregated and released.  (Dkt. #55).  The Court

granted Defendant's request (Dkt. #56), and on November 25, 2020, Defendant

released a redacted version of the Report to Plaintiffs (2d Blackwell Decl.¶ 7).

On December 4, 2020, Defendant submitted its supplemental brief, and the

parties' cross-motions for summary judgment became fully briefed and ripe for

decision on December 18, 2020, when Plaintiffs submitted their supplemental

brief.  (*See* Dkt. #57-59).

**DISCUSSION**

**A.    Applicable Law**

**1.    FOIA Generally**

FOIA vests federal courts with "jurisdiction to enjoin [a federal] agency

from withholding agency records and to order the production of any agency

records improperly withheld[.]"  5 U.S.C. § 552(a)(4)(B).[6]  The statute demands

disclosure of any requested "agency records" unless they fall within one of

FOIA's enumerated exemptions.  *See Grand Cent. P'ship, Inc.* v. *Cuomo*, 166

F.3d 473, 478 (2d Cir. 1999); *Adamowicz* v. *Internal Revenue Serv.*, 672

F. Supp. 2d 454, 461 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 648 (2d Cir. 2010)

(summary order).  "'The government bears the burden of demonstrating that an

exemption applies to each item of information it seeks to withhold, and all

doubts as to the applicability of the exemption must be resolved in favor of

---

6    The Second Circuit has explained that "jurisdiction," in this context, refers to a federal
     court's "remedial power, not subject-matter jurisdiction," meaning that 5 U.S.C.
     § 552(a)(4)(B) "does not speak to the court's ability to adjudicate a claim, but only to the
     remedies that the court may award."  *Main St. Legal Servs., Inc.* v. *Nat'l Sec. Council*,
     811 F.3d 542, 566 (2d Cir. 2016).

12

disclosure.'"  *Florez* v. *Cent. Intel. Agency*, 829 F.3d 178, 182 (2d Cir. 2016)
(quoting *Ctr. for Const. Rights* v. *Cent. Intel. Agency*, 765 F.3d 161, 166 (2d Cir.
2014)).  "Exceptions to FOIA's general principle of 'broad disclosure of
Government records ... have consistently been given a narrow compass.'"  *Ctr.
for Const. Rights*, 765 F.3d at 166 (alteration in original) (quoting *N.Y. Times Co.*
v. *U.S. Dep't of Justice*, 756 F.3d 100, 111 (2d Cir. 2014)).

FOIA thus allows public access to information held by agencies of the
federal government, but such access is not limitless: in enacting FOIA,
Congress sought to strike a balance between the public's interest in
government transparency and accountability, and the government's need to
hold sensitive information in confidence.  *See Nat'l Council of La Raza* v. *U.S.
Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005); *Nat. Res. Def. Council,
Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 397 (S.D.N.Y. 2014) (quoting
*John Doe Agency* v. *John Doe Corp.*, 493 U.S. 146, 152 (1989)).

### 2. The FOIA Improvement Act of 2016

In 2016, Congress passed the FOIA Improvement Act of 2016 (the "FIA"),
Pub. L. No. 114-185, 130 Stat. 538 (2016), which, *inter alia*, "add[ed] an
additional 'foreseeable harm' requirement."  *Seife* v. *Food & Drug Admin.*,
— F. Supp. 3d. —, No. 17 Civ. 3960 (JMF), 2020 WL 5913525, at *5 (S.D.N.Y.
Oct. 6, 2020).  The foreseeable harm standard prohibits agencies from
withholding information unless (i) "the agency reasonably foresees that
disclosure of the record would harm an interest protected by an exemption," or
(ii) "disclosure is prohibited by law."  *Ctr. for Investigative Reporting* v. *U.S.*

*Customs & Border Patrol*, 436 F. Supp. 3d 90, 105 (D.D.C. 2019) (quoting 5 U.S.C. § 552(a)(8)(A)(i). Therefore, "FOIA now requires that an agency 'release a record — even if it falls within a FOIA exemption — if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law.'" *Id.* (quoting *Judicial Watch, Inc.* v. *U.S. Dep't of Justice*, No. 17 Civ. 832 (CKK), 2019 WL 4644029, at *3 (D.D.C. Sept. 24, 2019)); *see also Ctr. for Investigative Reporting* v. *U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) ("[E]ven if information falls within the scope of a discretionary exemption, [under the FIA] it cannot be withheld from the public unless the agency also shows that disclosure will harm the interest protected by that exemption."). The FIA thus "'imposes an independent and meaningful requirement on agencies before they may withhold a record under one of FOIA's exemptions.'" *Seife*, 2020 WL 5913525, at *5 (quoting *Nat. Res. Def. Council, Inc.* v. *Envtl. Prot. Agency*, No. 17 Civ. 5928 (JMF), 2019 WL 4142725, at *3 (S.D.N.Y. Aug. 30, 2019)); *see also Judicial Watch, Inc.* v. *U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (holding that the FIA's foreseeable harm standard imposes a "heightened standard for an agency's withholding").

### 3. Resolving FOIA Claims at Summary Judgment

Summary judgment is the usual mechanism for resolving disputes under FOIA. *See Kaye* v. *U.S. Dep't of Homeland Sec.*, No. 16 Civ. 9384 (VEC), 2018 WL 456303, at *1 (S.D.N.Y. Jan. 17, 2018); *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017). A district court considering

14

a FOIA claim "may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Grand Cent. P'ship, Inc.*, 166 F.3d at 478 (quoting *Gallant* v. *Nat'l Lab. Rels. Bd.*, 26 F.3d 168, 171 (D.C. Cir. 1994)); *see also Garcia* v. *U.S. Dep't of Justice, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) ("If the agency's submissions are facially adequate, summary judgment is warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply."). "[W]here the agency's submissions are 'adequate on their face,' district courts 'may forgo discovery and award summary judgment on the basis of affidavits.'" *N.Y. Times Co.*, 235 F. Supp. 3d at 529 (quoting *Carney* v. *U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)). Conversely, "'[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Nat. Res. Def. Council, Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d at 398 (quoting *N.Y. Times Co.* v. *U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007)).

### 4. *In Camera* Review

FOIA provides that district courts "may examine the contents of such agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the [FOIA] exemptions[.]" 5 U.S.C.

§ 552(a)(4)(B).  However, *in camera* review "is considered the exception, not the

rule, and the propriety of such review is a matter entrusted to the district

court's discretion."  *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO* v. *Nat'l Lab.*

*Rels. Bd.*, 845 F.2d 1177, 1180 (2d Cir. 1988).  *In camera* review of agency

documents in dispute in FOIA actions is appropriate where, for example,

(i) "the record is vague or the agency claims too sweeping or suggestive of bad

faith[,]" *Hopkins* v. *U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 86 (2d Cir.

1991) (construing *Lead Indus. Ass'n, Inc.* v. *Occupational Safety & Health*

*Admin.*, 610 F.2d 70, 88 (2d Cir. 1979)); (ii) the agency's affidavits are

"contradicted by other evidence in the record," *Adelante Ala. Worker Ctr.* v. *U.S.*

*Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 360 (S.D.N.Y. 2019); or

(iii) "when the requested documents are few in number and of short length"

such that "in camera review may save time and money," *id.* (internal quotation

marks and citations omitted).

**B.    Analysis**

Defendant and Intervenor invoke two FOIA exemptions to justify the bulk

of the withheld portions of the Redacted Report: (i) Exemption 4, covering

records that are "trade secrets and commercial or financial information

obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4);

and (ii) Exemption 5, covering "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party other than an agency in

litigation with the agency," *id.* § 552(b)(5).[7]  The Court considers each

exemption in turn.[8]

   To substantiate its decision to withhold the Report pursuant to these

FOIA exemptions, Defendant has submitted two declarations from Jennifer L.

Blackwell, a senior trial attorney with ENRD (*see* 1st Blackwell Decl. ¶ 1; 2d

Blackwell Decl. ¶ 1), and one declaration from Michael A. Sullivan, an attorney

who served as counsel to the Monitor and the Monitor's team (*see* Sullivan

Decl. ¶ 1).  Intervenor submitted a declaration from Thomas Meiers, Chief

Coordinator of the Volkswagen Group U.S. Monitorship, whose duties include

serving as the principal liaison for VW to the Monitor.  (Meiers Decl. ¶ 1).

### 1.   DOJ's Withholding Pursuant to Exemption 4 Is Overbroad

#### a.   Applicable Law

   FOIA's Exemption 4 excludes from disclosure matters that are "trade

secrets and commercial or financial information obtained from a person and

privileged or confidential[.]"  5 U.S.C. § 552(b)(4).  For Exemption 4 to apply, a

---

[7]   Defendant also withholds portions of the Report pursuant to FOIA Exemptions 6 and
7(C) (Def. Br. 21-23), which exemptions generally prevent disclosure of records or
information that contain certain personal information implicating the privacy interests
of individuals, *see* 5 U.S.C. § 552(b)(6), (7)(C).  Plaintiffs do not contest that Defendant
may redact personally identifying information from the Report as applicable under these
exemptions (Pl. Br. 8 n.3), and the Court sees no reason why the withholding pursuant
to these exemptions is inappropriate in the abstract.  However, Defendant does not
specify which information it redacted pursuant to these exemptions, so the Court
cannot be certain whether Defendant's withholding is overbroad in this context.
Because the Court orders *in camera* review to determine the appropriate scope of
withholding pursuant to Exemptions 4 and 5, it will at that time also review
Defendant's withholding pursuant to these other exemptions.

[8]   Intervenor focuses its briefing and argument on the application of Exemption 4, and
otherwise adopts the arguments advanced by Defendant with respect to Exemption 5.
(*See generally* VW Br.; VW Reply).  Therefore, when this Opinion refers to Defendant's
argument in the context of Exemption 5, it incorporates by reference Intervenor's
argument.

tripartite test must be satisfied: "'[i] [t]he information for which exemption is sought must be a trade secret or commercial or financial in character; [ii] it must be obtained from a person; and [iii] it must be privileged or confidential.'" *Bloomberg, L.P.* v. *Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (emphasis omitted) (quoting *Nadler* v. *FDIC*, 92 F.3d 93, 95 (2d Cir. 1996)).

To qualify under the first prong of this test, "information itself must in some fashion be commercial or financial in nature or use." *N.Y. Pub. Int. Rsch. Grp.* v. *Envtl. Prot. Agency*, 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003). Generally, records are commercial if they "'actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business.'" *100Reporters LLC* v. *U.S. Dep't of Justice* ("*100Reporters II*"), 316 F. Supp. 3d 124, 140 (D.D.C. 2018) (quoting *Pub. Citizen Health Rsch. Grp.* v. *Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)); *see also Intell. Prop. Watch* v. *U.S. Trade Rep.*, 134 F. Supp. 3d 726, 744 (S.D.N.Y. 2015) ("'Whatever commercial or financial means at the margins, at its core are records that reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business.'" (quoting *Plumbers & Gasfitters Local Union No. 1* v. *U.S. Dep't of Interior*, No. 10 Civ. 4882 (CBA), 2011 WL 5117577, at *2 (E.D.N.Y. Oct. 26, 2011)). Commercial records must have "intrinsic commercial value" that "could be compromised by ... disclosure," and they typically reveal something "about the nature and character of [a third party's]

business, or its revenues, expenses or income." *N.Y. Pub. Int. Rsch. Grp.*, 249
F. Supp. 2d at 333.  Thus, "not every bit of information submitted to the
government by a commercial entity qualifies for protection under Exemption 4."
*Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

For purposes of the second prong, "FOIA defines a 'person' as including
'an individual, partnership, corporation, association, or public or private
organization other than an agency." *Bloomberg, L.P.*, 601 F.3d at 148 (quoting
5 U.S.C. § 551(2)).  Thus, "Exemption 4 applies to, and shields, only
information that is not 'generated within the Government,'" and does not "block
disclosure of proprietary governmental information[.]" *Nat. Res. Def. Council,
Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d at 399-400 (quoting *Bloomberg, L.P.*,
601 F.3d at 148).

Under the third prong of Exemption 4's tripartite test, the exemption
applies where the commercial or financial information is "'both customarily and
actually treated as private by its owner,' and, perhaps as well, 'provided to the
government under an assurance of privacy.'" *Ctr. for Investigative Reporting*,
436 F. Supp. 3d at 109 (quoting *Food Mktg. Inst.* v. *Argus Leader Media*, 139
S. Ct. 2356, 2366 (2019)).

### b.    Analysis

Defendant and Intervenor assert that portions of the Report may be
withheld pursuant to Exemption 4.  (*See, e.g.*, Def. Br. 2; Def. Supp. Br. 1; 2d

Blackwell Decl. ¶¶ 22-27).[9]  As explained below, however, the Court agrees with Plaintiffs that Defendant and Intervenor have failed to establish that any significant portion of the Report is comprised of "commercial" information within the meaning of Exemption 4.  The Court rejects Intervenor's and Defendant's argument that all information about VW's compliance program is itself commercial and exempt under Exemption 4.  Neither Defendant nor Intervenor is therefore entitled to summary judgment on Exemption 4 withholding.  However, Defendant and Intervenor have sufficiently established that the Report likely contains some commercial information and that such information is "confidential."  Thus, the Court denies Plaintiffs' cross-motion for summary judgment on Exemption 4 as well, and orders *in camera* review.

### i.   The Court Rejects Defendant's and Intervenor's Overbroad Definition of "Commercial"

The parties dispute whether the information withheld pursuant to Exemption 4 is "commercial information" within the meaning of that FOIA exemption.  Intervenor argues that the commercial and financial information in the Report protected by Exemption 4 includes material about:

> i.   VW's product development processes, including software development;

---

[9]   In Intervenor's initial submissions, it argued that the entirety of the Report may be withheld under Exemption 4.  (*See* VW Br. 3).  However, it appears that through consultation with Defendant as part of Defendant's second segregability analysis, VW has changed its position, such that it now asserts that Exemption 4 only applies to portions of the Report, not to the Report in its entirety.  (*See* 2d Blackwell Decl. ¶ 26 (noting that VW "no longer object[s] to release of much of the information about which ENRD had raised questions" as to the applicability of Exemption 4)).  Nevertheless, the Court still considers all the arguments advanced by Intervenor in its initial submissions in order to ensure that the parties' arguments on the applicability of Exemption 4 are fully considered.

  ii. VW's business partner management and compliance functions, including with respect to suppliers and sales partners;

  iii. VW's internal environmental compliance initiatives;

  iv. VW's internal human resources functions and employee discipline;

  v. VW's code of conduct;

  vi. VW's whistleblower system; and

  vii. VW's risk management and internal control systems.

(Meiers Decl. ¶ 11; *see also id.* at ¶ 16 ("[P]ublishing the [Report] would result in the disclosure of ... proprietary information about how [VW] operates, including our compliance systems and product development.")).  As part of Defendant's second segregability analysis, Defendant reconsidered each of Intervenor's assertions of Exemption 4, and "withheld under Exemption 4 information that it would otherwise have released only after a careful, independent review."  (Def. Supp. Br. 10; *see also* 2d Blackwell Decl. ¶¶ 22-27).  Following its second segregability analysis, the "commercial information" that Defendant withheld in the Redacted Report pursuant to Exemption 4 is related to:

  i. VW's compliance and ethics programs;

  ii. VW's hiring, promotion, and disciplinary processes;

  iii. VW's internal sales goals;

  iv. VW's training materials;

     v.    VW's    internal    analyses    of    misconduct, compliance, and related matters; and

     vi.   the relationship between VW's internal processes, procedures, and governmental structures, on the one hand, and its ability to successfully design and implement a robust compliance program, in compliance with the Plea Agreement.

(2d Blackwell Decl. ¶ 27).  As discussed in greater detail below, the Court concludes that the only information Defendant has listed above that can fairly be construed as commercial is information related to "VW's internal sales goals." (*Id.*).  On the record currently before the Court, the other five categories of information, standing alone, are not sufficiently commercial to warrant withholding under Exemption 4.  Rather, they are all elements comprising VW's compliance program.

Defendant and Intervenor cite to a line of decisions from the United States District Court for the District of Columbia that they believe stand for the proposition that information about VW's compliance program, as enumerated above, is "commercial" within the meaning of Exemption 4.  (*See, e.g.*, Def. Supp. Br. 9-10 (citing *100Reporters II*, 316 F. Supp. 3d at 142); VW Reply 6-7 & nn.4-5 (citing *100Reporters LLC* v. *U.S. Dep't of Justice* ("*100Reporters I*"), 248 F. Supp. 3d 115, 136-41 (D.D.C. 2017); *Pub. Citizen* v. *U.S. Dep't of Health & Human Servs.* ("*Public Citizen II*"), 66 F. Supp. 3d 196, 208 (D.D.C. 2013); *Pub. Citizen* v. *U.S. Dep't of Health & Hum. Servs.* ("*Public Citizen I*"), 975 F. Supp. 2d 81, 108-09 (D.D.C. 2013)); *see also* Def. Supp. Br. 8-10).  Plaintiffs argue that, by asking this Court to echo the reasoning of several out-of-circuit district court cases, Defendant and Intervenor espouse an unduly broad

22

"commercial interest" standard that has not been adopted in the Second

Circuit.  (Pl. Reply 4; *see also* Def. Supp. Br. 9 (arguing that Exemption 4

"'reaches more broadly and applies (among other situations) when the provider

of the information has a commercial interest in the information submitted to

the agency'" (quoting *Baker & Hostetler LLP* v. *U.S. Dep't of Commerce*, 473 F.3d

312, 319 (D.C. Cir. 2006)))).[10]

The Second Circuit has not yet addressed whether information about the

implementation of a company's compliance program is itself "commercial"

within the meaning of Exemption 4, as Defendant and Intervenor assert.  But

although the terms "commercial" and "financial" have not been precisely

defined by the Second Circuit, *see Am. Airlines, Inc.* v. *Nat'l Mediation Bd.*, 588

F.2d 863, 870 (2d Cir. 1978) (defining "commercial" as "pertaining or relating to

or dealing with commerce"), courts in this Circuit have noted that Exemption 4

includes at least information that has "intrinsic commercial value," the

disclosure of which would "jeopardize [a commercial entity's] commercial

interests or reveal information about [its] ongoing operations."  *N.Y. Pub. Int.*

*Rsch. Grp.*, 249 F. Supp. 2d at 334.

---

[10]     Under the D.C. Circuit's "commercial interest" standard, Exemption 4 "'applies ... when
the provider of the information has a commercial interest in the information submitted
to the agency.'"  *100Reporters LLC* v. *U.S. Dep't of Justice*, 316 F. Supp. 3d 124, 140
(D.D.C. 2018) ("*100Reporters II*") (quoting *Baker & Hostetler LLP* v. *U.S. Dep't of
Commerce*, 473 F.3d 312, 319-20 (D.C. Cir. 2006)); *see also id.* (explaining that "in the
D.C. Circuit," this articulation of "Exemption 4 reaches more broadly").  Some courts
applying this standard have further broadened it to include "[i]nformation that is
'instrumental' to a commercial interest."  *100Reporters LLC* v. *U.S. Dep't of Justice*, 248
F. Supp. 3d 115, 137 (D.D.C. 2017) ("*100Reporters I*").

Regardless of whether the Second Circuit has adopted the "commercial interest" standard, the Court finds that the cases that Intervenor and Defendant cite do not establish that information about VW's compliance program, without more, is sufficiently commercial to warrant withholding. A review of these decisions reveals that, for the most part, these courts have determined that information about or related to a compliance program is subject to exemption only when it is intertwined with other information that can fairly be described as commercial. Thus, to withhold information related to a company's compliance program — such as "hiring, promotion, and disciplinary processes"; "training materials"; and "internal analyses of misconduct, compliance and related matters" (2d Blackwell Decl. ¶ 27) — it must be intertwined with information that is commercial within the Second Circuit's arguably narrower interpretation of that word as "reveal[ing] basic commercial operations, such as sales statistics, profits and losses, and inventories, or relat[ing] to the income-producing aspects of a business." *Intell. Prop. Watch*, 134 F. Supp. 3d at 744.

In the first opinion in the line of cases Defendant and Intervenor cite, *Public Citizen I*, the United States District Court for the District of Columbia held that reports compiled by "Independent Review Organizations" tasked with overseeing corporate integrity agreements between the government and several pharmaceutical companies were commercial, but only because the reports "include extensive information about the [commercial entity's] marketing and sales programs and contracting processes." 975 F. Supp. 2d at 108. Similar

24

information is not at issue here, as neither Defendant nor Intervenor has claimed that the Report contains extensive information about VW's marketing and sales programs or contracting processes.  (*See generally* Def. Br.; Def. Reply; VW Br.; VW Reply; Def. Supp. Br.).[11]  The *Public Citizen I* court denied summary judgment as to, *inter alia*, two other categories of compliance-related documents, finding that the government provided insufficient information to determine whether the documents were commercial.  *Id.* at 104.

In *Public Citizen II*, the court revisited the two categories of documents as to which it previously denied summary judgment in *Public Citizen I*.  66 F. Supp. 3d at 207-08.[12]  The court determined that both categories were commercial within the meaning of Exemption 4.  *Id.*  The court explained that one category of documents was commercial because the documents dealt explicitly with sales, marketing, and promotional practices, *id.* at 207, information not at issue in this case.  The court ruled that the other set of documents was commercial because the documents contained "information about interactions between the companies' salespeople and customers, how the companies promote their products, and the way the companies implement their

---

[11]    As discussed below, the Court does not dispute that information about VW's "internal sales goals" may be withheld pursuant to Exemption 4 (2d Blackwell Decl. ¶ 27), but this is a very narrow category of information and Defendant and Intervenor have not established that it is so intertwined with other information about VW's compliance initiatives that all information about compliance initiatives must be withheld.  (*See id.*).

[12]    These records, in relevant part, were not reports from an independent monitor, but were instead summaries of "reportable events" (*i.e.*, potential violations of federal law or of the settlement agreement), and "disclosure logs," a compilation of all internal compliance reports received and actions taken in response.  *Public Citizen* v. *U.S. Dep't of Health & Hum. Servs.* ("*Public Citizen II*"), 66 F. Supp. 3d 196, 204 n.11, 205 n.12 (D.D.C. 2014).

compliance programs."  *Id.* at 208.  Thus, *Public Citizen II* suggests that

information about how a company implements its compliance program may be

one element to consider when determining whether information is commercial,

but is not dispositive on its own.

In *100Reporters I*, the court relied on the *Public Citizen* cases discussed

above to determine that the annual report of an independent monitor

overseeing Siemens's compliance with a plea agreement contained commercial

information because it addressed the monitored entity's "'marketing and sales

program and contracting processes.'"  248 F. Supp. 3d at 136 (construing

*Public Citizen I*, 975 F. Supp. 2d at 109).  Quoting the parties' declarations, the

court explained that

> the reports describe and evaluate Siemens'[s]
> compliance programs, including *references to finance
> functions, mergers and acquisitions practices, and sales
> and marketing*.  The reports also detail *actual* "*country
> operations, projects, contracts, and bids*."  More
> specifically, the annual reports "include observations
> and assessments *with respect to particular M & A
> transactions*" and "*identif[y] ... particular Siemens
> business partners* and provide[ ] Siemens'[s] assessment
> of the same."

*Id.* (alteration in original) (emphasis added) (citations omitted).  As evident from

the court's description, nearly all the information intertwined with material

about the compliance program had "intrinsic commercial value" that "could be

compromised by ... disclosure."  *N.Y. Pub. Int. Rsch. Grp.*, 249 F. Supp. 2d at

333.  Although the court determined that this description was sufficient to

establish that information about Siemens's compliance programs was

commercial, the court ordered the government to produce one of the monitor's

annual reports at issue for *in camera* review to determine whether DOJ properly withheld the entirety of the document under, *inter alia*, Exemption 4. *100Reporters I*, 248 F. Supp. 3d at 145 n.13, 166.  The *100Reporters I* court also addressed whether Siemens's training and compliance documents (as distinct from information about the implementation of a compliance program included in the monitor's report) were commercial; in doing so, the court explicitly stated that the commercial nature of such materials was dubious because they "do not appear to directly 'relate to the income-producing aspects of a business.'"  *Id.* at 137 (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290).[13]

The final decision in this line of cases, and the one on which Intervenor and Defendant rely most heavily, is *100Reporters II*.  After *in camera* review of one of the monitor's annual reports, as ordered in *100Reporters I*, the district court found that the government properly withheld most — but not all — of the report, in part on Exemption 4 grounds.  First, the court explained that Exemption 4 applied to one chapter where the report "contain[ed] detailed

---

[13]    The *100Reporters I* court only found these documents to be commercial under an expansive reading of the "commercial interests" standard, explaining that "[i]nformation that is 'instrumental' to a commercial interest is sufficiently commercial for the purposes of Exemption 4," and that "information about 'the way the companies implement their compliance programs' was 'sufficiently instrumental' to the companies' operations to qualify as 'commercial.'"  *100Reporters I*, 248 F. Supp. 3d at 137 (quoting *Public Citizen II*, 66 F. Supp. 3d at 208).  As an initial matter, the parties in this case are not asking the Court to determine whether any of VW's actual compliance documents or training materials is commercial.  However, the Court notes that this expansive interpretation of commercial — *i.e.*, not just items in which a company has a commercial interest, but anything "instrumental" to that commercial interest — is much broader than the definition applied in this Circuit, where courts have explained that commercial information generally has "intrinsic commercial value," that would "jeopardize [a commercial entity's] commercial interests or reveal information about [its] ongoing operations."  *N.Y. Pub. Int. Rsch. Grp.*, 249 F. Supp. 2d at 334.

analyses of Siemens'[s] *business operations*, and how those operations addressed each focus area [for remediation]."  *100Reporters II*, 316 F. Supp. 3d at 142 (emphasis added).  Thus, to the extent information about the implementation of a compliance program "contains detailed analyses" of VW's "business operations," Exemption 4 is warranted here.  *Id.*  However, as noted above, the *100Reporters II* court required *in camera* review to determine whether this was the case, finding the initial declarations to be insufficient to warrant application of Exemption 4 to the entire report.  And as noted below, on the current record, Defendant and Intervenor fail to demonstrate with sufficient detail or specificity that the Report's descriptions of the implementation of VW's compliance program are intertwined with descriptions of VW's business operations.

The *100Reporters II* court next explained that other portions of the report were "commercial" within the meaning of Exemption 4 because they contained detailed information about specific initiatives and business decisions. *100Reporters II*, 316 F. Supp. 3d at 142.  Specifically, the court explained that this information "reveal[ed] basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate[d] to the income-producing aspects of a business."  *Id.* (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290).  Finally, citing *Public Citizen II*, the court withheld two portions of the report because it determined that information about the way Siemens implemented its compliance programs was itself commercial.  *Id.* (citing *Public Citizen II*, 66 F. Supp. 3d at 208).  But as discussed above, the

Court does not read *Public Citizen II* to hold that information about

implementation of a compliance program is necessarily commercial; instead,

the *Public Citizen II* court pointed to other information that clearly had an

"intrinsic commercial value[.]"  *Pub. Int. Rsch. Grp.* 249 F. Supp. 2d at 334.  In

any event, the court in *100Reporters II* had detailed declarations explaining

what information the parties considered to be commercial, not to mention *in*

*camera* review to determine whether the government withheld too much

information pursuant to Exemption 4.

A review of these four opinions reveals that those courts that have

addressed whether information about a compliance program is "commercial"

within the meaning of Exemption 4 have determined that, with the limited

exception just discussed, such information is commercial only when

intertwined with other information that can fairly be described as commercial,

such as (i) "sales statistics, profits and losses, and inventories," *100Reporters*

*II*, 316 F. Supp. 3d at 142; (ii) "references to finance functions, mergers and

acquisitions practices, and sales and marketing," or information about

"country operations, projects, contracts, and bids," *100Reporters I*, 248 F.

Supp. 3d at 136; (iii) "information about interactions between the companies'

salespeople and customers," or "how the companies promote their products,"

*Public Citizen II*, 66 F. Supp. 3d at 208; and (iv) "extensive information about

the [company's] marketing and sales programs and contracting processes,"

*Public Citizen I*, 975 F. Supp. 2d at 109.  On the one occasion when a court

applied Exemption 4 simply because the information concerned the

implementation of a compliance program, the court had already conducted an

*in camera* review of the withheld document.  *See 100Reporters II*, 316 F. Supp.

3d at 142.  For these reasons, the Court declines to find that information about

the design, implementation, and remediation of VW's compliance program is

commercial in and of itself, even under the arguably more expansive

interpretation of "commercial" employed in the D.C. Circuit.

Unlike *Public Citizen I & II*, and *100Reporters I & II*, Defendant and

Intervenor have not provided any detailed explanation that suggests that

information about VW's compliance program is intertwined with commercial

information, such as "sales statistics, profits and losses, and inventories,"

*100Reporters II*, 316 F. Supp. 3d at 142, or "extensive information about the

[company's] marketing and sales programs and contracting processes," *Public

Citizen I*, 975 F. Supp. 2d at 108.  Defendant describes the Report as:

> replete with details about the company's compliance
> programs at the onset of the monitorship, the Monitor's
> activities during the initial review, the company's
> remediation of its compliance programs, VW's
> disciplinary process, the Monitor's observations about
> corporate matters that could affect compliance, and the
> Monitor's recommendations for corporate change.

(1st Blackwell Decl. ¶ 25; *see also* 2d Blackwell Decl. ¶ 27).  But this

description suggests that the Report is focused primarily on compliance

without reference to any specific information that "relate[s] to the income-

producing aspects of a business."  *Intell. Prop. Watch*, 134 F. Supp. 3d at 744.

Defendant says that the Report contains information such as "how the

Monitor approached the review, [VW's] interface with the Monitor, how the

Monitor collected documents and engaged in interviews ... , and the Monitor's participation and observation of VW meetings and conferences." (1st Blackwell Decl. ¶ 26; *see also id.* at ¶ 25 ("The Monitor's observations include inferences and conclusions from activities and processes the Monitor has witnessed[.]")). Defendant and Intervenor argue that this information is commercial or may be intertwined with commercial information. (*See, e.g.*, Def. Reply 8; VW Reply 4; *see also* Meiers Decl. ¶ 16 ("[P]ublishing the [Report] would result in the disclosure of ... proprietary information about how [VW] operates, including our compliance systems and product development.")). These activities and processes may indeed convey commercial information; however, mere incantations that such information is itself commercial or contains commercial information do not suffice. *See 100Reporters I*, 248 F. Supp. 3d at 136 (requiring "additional evidence" to support the assertion that a report contains commercial information where the government's declarant submitted a "conclusory statement").

As the decisions in *100Reporters I* and *Public Citizen I* suggest, the parties must provide more detail to support their assertions. In both cases, the court required the government to provide additional evidence to substantiate vague or insufficient claims that information about a company's compliance program was so intertwined with commercial information that it merited withholding under Exemption 4. *See 100Reporters I*, 248 F. Supp. 3d at 145 n.13, 166; *Public Citizen I*, 975 F. Supp. 2d at 104. A review of the Redacted Report supports this conclusion. (*See, e.g.*, Redacted Report 15 (redacting the

31

definitions of different types of in-person meetings — not descriptions of specific meetings — the Monitor had with VW personnel in a section describing the Monitor's activities); *id.* at 35-46 (redacting descriptions of VW's various compliance initiatives)).[14]

Nor have Defendant and Intervenor sufficiently pointed to other commercial information that warrants large-scale withholding under Exemption 4.  As noted above, much of the information flagged by Defendant and Intervenor is directly related to the implementation and remediation of VW's compliance program.  And while VW may have good reason to keep information about the remediation of its compliance program private, information about, for example, VW's "corporate culture," "compliance structure," or "code of conduct" (1st Blackwell Decl. ¶ 27, Meiers Decl. ¶ 11), cannot fairly be said to have "intrinsic commercial value," *N.Y. Pub. Int. Rsch. Grp.*, 249 F. Supp. 2d at 334, or to "relate to the income-producing aspects of a business," *Intell. Prop. Watch*, 134 F. Supp. 3d at 744; *cf. 100Reporters I*, 248 F. Supp. 3d at 137 (explaining that "compliance and training materials do not appear to directly 'relate to the income-producing aspects of a business'" (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290))).

This is not to say that Defendant and Intervenor have failed to establish that the report contains *some* information that is commercial.  For example,

---

[14]    Although the Redacted Report does not specify the grounds on which Defendant has withheld individual portions of the Report, the Court cannot see how this factual information is protected by Exemption 5 and thus assumes Defendant has redacted it pursuant to Exemption 4.

the Meiers and Blackwell Declarations do highlight some information in the Report that may in and of itself serve a commercial function, *see Am. Airlines, Inc.*, 588 F.2d at 870, such as "product development processes, including software development" (Meiers Decl. ¶ 11) and "internal sales goals" (2d Blackwell Decl. ¶ 27). However, as discussed below, Defendant and Intervenor have not established where and to what extent this information appears in the Report, nor that the information about these subjects is sufficiently detailed to be commercial within the meaning of Exemption 4.

### ii.   Any Commercial Information in the Report Is Confidential

As the Supreme Court recently ruled in *Food Marketing Institute* v. *Argus Leader Media*, as long as the information provided to the government by a commercial entity "is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy," it is "confidential" within the meaning of Exemption 4. 139 S. Ct. at 2366. The Court agrees with Defendant and Intervenor that the plain language of the Plea Agreement and evidence in the Blackwell and Meiers Declarations establish that the information here meets the confidentiality requirements as articulated in *Argus Leader*.

*First*, the Meiers and Blackwell Declarations adequately establish that the Report contains information that VW "customarily and actually treated as private." *Argus Leader*, 139 S. Ct. at 2366. All three declarations list categories of information that VW customarily keeps confidential. (*See* 1st Blackwell Decl. ¶ 27; 2d Blackwell Decl. ¶¶ 22, 27; Meiers Decl. ¶ 16). *Second*,

33

the information in the Report was "provided to the government under an assurance of privacy." *Argus Leader*, 139 S. Ct. at 2366.  The Plea Agreement states that "the [Monitor's reports] and the contents thereof are intended to remain and shall remain non-public." (Plea Agreement, Ex. 3 at ¶ 23; *see also* 1st Blackwell Decl. ¶ 33).  Additionally, the Monitor assured VW that information shared would be kept confidential by entering a non-disclosure agreement.  (1st Blackwell Decl. ¶ 33; Meiers Decl. ¶ 9).  Defendant and Intervenor further note their intention to keep the report private.  (*See* 1st Blackwell Decl. ¶ 24; Meiers Decl. ¶¶ 12-13).

Plaintiffs argue that the Plea Agreement does not provide any assurance of confidentiality because it allows Defendant to "determine in [its] sole discretion that disclosure would be in furtherance of the [DOJ's] discharge of [its] duties and responsibilities or is otherwise required by law." (Plea Agreement, Ex. 3 at ¶ 23; *see also* Pl. Br. 13; Pl. Supp. Br. 9).  However, the Court does not accept Plaintiffs' reading, which would render the Plea Agreement's assurance of confidentiality superfluous.  *See Cap. Ventures Int'l* v. *Rep. of Argentina*, 552 F.3d 289, 294 (2d Cir. 2009).  Nor does the release of portions of the Report by Defendant after determining that withholding was improper under FOIA undermine assurances of confidentiality with respect to commercial information provided by Intervenor, because the portions of the Report that were released plainly contained no commercial information.  Releasing portions of the Report not subject to withholding under FOIA is precisely what the law requires.  *See* 5 U.S.C. § 552(b).  Thus, to the extent the

34

Report contains any commercial information, such information meets the confidentiality requirements articulated in *Argus Leader*.

### iii.   Defendant and Intervenor Fail to Satisfy the Foreseeable Harm Standard

There remains the hurdle imposed by the FIA that otherwise exempt information be disclosed unless "'the agency reasonably foresees that disclosure of the record would harm an interest protected by [an] exemption,'" or the "'disclosure is prohibited by law.'"  *Rosenberg* v. *U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018) (quoting 5 U.S.C. § 552(a)(8)(A)).  Plaintiffs argue that Defendant and Intervenor have failed to establish that the release of any confidential commercial information will foreseeably harm the interests protected by Exemption 4.  (Pl. Reply 10).  Defendant and Intervenor counter that Plaintiffs are effectively asking the Court to revive the "substantial competitive harm" requirement eliminated by the Supreme Court in *Argus Leader*, 139 S. Ct. at 2364-66.  (Def. Reply 9 n.5; VW Reply 11-12).  Defendant also notes a split in how district courts have delimited the Exemption 4 interest that must be harmed to satisfy the FIA.  (Def. Supp. Br. 14).[15]

---

[15]   *Argus Leader* was filed before the FIA was enacted, and the Supreme Court thus had no occasion to pass on the foreseeable harm standard.  *See Ctr. for Investigative Reporting* v. *U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) (discussing interplay between *Argus Leader* and the FIA).  District courts to address the issue have agreed that the FIA's foreseeable harm standard applies to Exemption 4, but have disagreed about the type of harm the standard covers with respect to Exemption 4.  *Compare Ctr. for Investigative Reporting* v. *U.S. Customs & Border Patrol*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019) (applying the substantial competitive harm test (citing *Nat'l Parks & Conservation Ass'n* v. *Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974))), *with Am. Small Bus. League* v. *U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019) (distinguishing foreseeable harm standard from substantial competitive harm test by explaining Exemption 4 protects confidentiality *qua* confidentiality).  *See also Seife* v. *Food & Drug Admin.*, — F. Supp. 3d —, No. 17 Civ. 3960 (JMF), 2020 WL 5913525, at *5 (S.D.N.Y. Oct. 6, 2020) (noting this split without deciding between approaches).

However, as discussed above, for nearly all of the information withheld pursuant to Exemption 4, Defendant and Intervenor "have not established that the withheld information falls within the scope of Exemption 4 in the first instance." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113. As such, "they have, *a fortiori*, failed to satisfy the 'heightened' foreseeable-harm requirement as well." *Id.* Accordingly, the Court need not resolve any potential dispute over the type of foreseeable harm required under the FIA at this time.

### iv.   The Court Orders *In Camera* Review

As noted above, Defendant has established that there is likely *some* commercial information in the Report that may be properly redacted pursuant to Exemption 4, but has not established where and to what extent this information appears. Plaintiffs asks that, should the Court deny their cross-motion for summary judgment, the Court review the Report *in camera* to ensure that all segregable and non-exempt information is released. (*See* Pl. Supp. Br. 11-12). Defendant argues that it has already reviewed and produced all reasonably segregable material. (*See* 2d Blackwell Decl. ¶¶ 33-36).

The Court's careful review of the Redacted Report reinforces its finding that Defendant's assertion of Exemption 4 was overbroad, and further demonstrates that Defendant has withheld information that is not commercial and is therefore not protected from disclosure by Exemption 4. For example, Defendant has redacted what appears to be a large swath of the Report that contains factual information about VW's compliance program, including "cultural initiatives and programs," "integrity," and similarly noncommercial

36

information.  (*See, e.g.*, Redacted Report 32-48).[16]  Similarly, Defendant has

redacted portions of the Report that simply appear to describe VW's compliance

initiatives — information that does not "relate to the income-producing aspects

of a business," *Intell. Prop. Watch*, 134 F. Supp. 3d at 744, and is therefore not

properly withheld under Exemption 4.  (*See, e.g.*, Redacted Report 121-27).

Because "the agency claims [are] too sweeping," *Hopkins*, 929 F.2d at 86

(quotation omitted), as well as "contradicted by other evidence in the record,"

*Adelante Ala. Worker Ctr.*, 376 F. Supp. 3d at 360, the Court exercises its

discretion to order *in camera* review of the Report.

* * *

Because the Court rejects Defendant's and Intervenor's overbroad

assertion of Exemption 4, and finds that they have not established that the

Report contains other commercial information with sufficient specificity, the

Court denies Defendant's and Intervenor's motions for summary judgment with

regard to Defendant's withholding pursuant to Exemption 4.  But because

Defendant and Intervenor have provided sufficient information to establish that

the Report likely contains *some* commercial information properly withheld

pursuant to Exemption 4, Plaintiffs' cross-motion for summary judgment is

---

[16]    The Redacted Report does not specify the FOIA Exemptions under which Defendant purports to withhold specific portions of the Report, making review of Defendant's broad claims of entitlement to withholding challenging for Plaintiffs and for the Court. Nevertheless, based on unredacted portions of the Redacted Report and descriptions of the information withheld pursuant to Exemption 4 in the Supplemental Blackwell Declaration and Defendant's supplemental brief, the Court understands Defendant to be asserting Exemption 4 over the material discussed here.  (*See* 2d Blackwell Decl. ¶¶ 16, 27; Def. Supp. Br. 8-10).

likewise denied.  Instead, the Court orders Defendant to produce an
unredacted copy of the Report for *in camera* review.

>    **2.    DOJ's Withholding Pursuant to Exemption 5 Is Overbroad**

>    **a.    Applicable Law**

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency
memorandums or letters that would not be available by law to a party other
than an agency in litigation with the agency[.]"  5 U.S.C. § 552(b)(5).  "To
qualify, a document must thus satisfy two conditions: its source must be a
[g]overnment agency, and it must fall within the ambit of a privilege against
discovery under judicial standards that would govern litigation against the
agency that holds it."  *Dep't of Interior* v. *Klamath Water Users Protective Ass'n*,
532 U.S. 1, 8 (2001) ("*Klamath*").

Citing Exemption 5, Defendant has withheld portions of the Report
pursuant to the deliberative process privilege.  (*See, e.g.*, Def. Supp. Br. 3-8).
"The deliberative process privilege is designed to promote the quality of agency
decisions by preserving and encouraging candid discussion between officials."
*Nat'l Council of La Raza*, 411 F.3d at 356.  The privilege "rests on the obvious
realization that officials will not communicate candidly among themselves if
each remark is a potential item of discovery and front page news[.]"  *Klamath*,
532 U.S. at 8-9.

The deliberative process privilege is "a sub-species of work-product
privilege that 'covers documents reflecting advisory opinions, recommendations
and deliberations comprising part of a process by which governmental

decisions and policies are formulated[.]'" *Tigue* v. *U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (*quoting Klamath*, 532 U.S. at 8).  For Exemption 5 to apply to a document pursuant to the deliberative process privilege, (i) the document's source must be a government agency, *see Klamath*, 532 U.S. at 8, and the document must be (ii) "predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision," and (iii) "deliberative, *i.e.*, actually related to the process by which policies are formulated," *Nat'l Council of La Raza*, 411 F.3d at 356 (internal alterations and quotation marks omitted) (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).

"To find that a document is predecisional, [a] court must be able 'to pinpoint an agency decision or policy to which the document contributed,' or was intended to contribute." *Heartland All. for Human Needs & Human Rights* v. *U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018) (quoting *Senate of the Commonwealth of P.R.* v. *U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987)); *see also Grand Cent. P'ship, Inc.*, 166 F.3d at 482.  "Examples of the type of documents that might qualify as predecisional are 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Wilderness Soc'y* v. *U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 11 (D.D.C. 2004) (quoting *Coastal States Gas Corp.* v. *U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

As to the second prong, "[a] document is deliberative if 'the materials … bear on the formulation or exercise of agency policy-oriented *judgment*.'"

*Wilderness Soc'y*, 344 F. Supp. 2d at 11 (quoting *Petroleum Info. Corp.* v. *U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).  In other words, the document must "reflect[] the give-and-take of the consultative process," *Judicial Watch, Inc.* v. *Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Coastal States Gas Corp.*, 617 F.2d at 866), and have been "'generated as part of a definable decision-making process,'" *Heartland All. for Human Needs*, 291 F. Supp. 3d at 80 (quoting *Gold Anti-Tr. Action Comm., Inc.* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 762 F. Supp. 2d 123, 136 (D.D.C. 2011)).  This standard generally requires the agency to explain "'[i] the nature of the specific deliberative process involved, [ii] the function and significance of the documents in that process, and [iii] the nature of the decisionmaking authority vested in the document's author and recipient.'"  *Heartland All. for Human Needs,* 291 F. Supp. 3d at 80 (quoting *Nat'l Sec. Counselors* v. *Cent. Intel. Agency*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)).  "The privilege does not, however, as a general matter, cover 'purely factual' material."  *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (quoting *Hopkins*, 929 F.2d at 85).

> **b.    Analysis**

Defendant argues that the Report was primarily prepared to assist DOJ in making two discrete decisions: "whether VW is meeting its obligations under the Plea Agreement and whether to extend the term of the [m]onitorship[.]" (Def. Reply 6; *see also* Def. Br. 17).  Defendant adds that the Report was "prepared to assist DOJ's decisionmaking on several broader, related issues, such as whether DOJ needed to take any additional measures to ensure VW's

compliance with the Plea Agreement and DOJ's evaluation of the Monitor's work." (Def. Br. 17). Plaintiffs respond that Exemption 5 does not apply because the Monitor is not an agency employee and Exemption 5's "consultant corollary" does not apply; that DOJ's description of the decision or policy to which the Report contributed is overbroad; that Defendant has redacted factual information that is not deliberative; and that Defendant has failed to establish that the release of the Report would lead to a "foreseeable harm" under the FIA. (*See* Pl. Br. 14-18; Pl. Reply 6-7; Pl. Supp. Br. 2-6). As explained below, the Court agrees with Defendant that the consultant corollary applies, that the Report is predecisional, and that the Report is deliberative. However, after reviewing the Redacted Report and Defendant's submissions, the Court concludes that Defendant has redacted information more properly considered factual than deliberative, and orders *in camera* review of the Redacted Report to determine whether additional purely factual material can be properly released.

### i. The Consultant Corollary Applies

Although Exemption 5 generally applies only to documents that originate from a government agency, under the consultant corollary, Exemption 5 can apply to communications between the government and outside consultants. *See Tigue*, 312 F.3d at 77. "Because agencies commonly need recommendations from hired consultants, courts have determined that documents generated outside the agency but created pursuant to the request of the agency qualify as inter-agency memoranda for purposes of Exemption 5." *S.A. Ludsin & Co.* v. *U.S. Small Bus. Admin.*, No. 96 Civ 5972, 97 Civ 784

(EHN), 1998 WL 355394, at *3 (E.D.N.Y. Apr. 2, 1998) (citing *Ryan* v. *U.S. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)).

Defendant argues that although the Report was not created by DOJ itself, the Report may still properly be withheld under Exemption 5 because the consultant corollary applies.  (*See* Def. Supp. Br. 3-6).  In support of this argument, Defendant cites to*, inter alia*, the Supreme Court's articulation of the scope of the consultant corollary in *Klamath*, and the application of *Klamath* to documents created by an independent monitor in *100Reporters I*.  (*Id.*).  Taking these in reverse order, the Court observes that the court in *100Reporters I* addressed the precise issue of whether an independent monitor qualifies under Exemption 5's consultant corollary.  248 F. Supp. 3d at 149.  It defined the "core question" as "whether the Monitor represented the interests of himself or [the monitored company], or instead, exercised independent judgment."  *Id.* Finding that the Monitor exercised independent judgment, the court held that the corollary applied.  *Id.*

Plaintiffs protest that the court in *100Reporters I* applied an expansive interpretation of the consultant corollary that the D.C. Circuit has adopted, but that has not been endorsed by the Second Circuit.  (*See* Pl. Supp. Br. 2-3).  In the Second Circuit, according to Plaintiffs, the consultant corollary "appl[ies] only when a third-party is a 'pure objective proxy for the agency'" — what Plaintiffs call the "proxy test."  (Pl. Supp. Br. 2 (quoting *Intell. Prop. Watch*, 134 F. Supp. 3d at 748)).  However, despite Plaintiffs' arguments to the contrary, the Second "Circuit has *not* advised on how far [the consultant] corollary

extends[.]"  *Intell. Prop. Watch*, 134 F. Supp. 3d at 748.  More pointedly,

Plaintiffs' selective quotation of dicta in *Intellectual Property Watch* does not

convince this Court that the consultant corollary applies only when the "proxy

test" is satisfied.  (*See* Pl. Supp. Br. 2 (quoting *Intell. Prop. Watch*, 134 F. Supp.

3d at 748)).[17]  Nor does the Court believe that the fact that the Monitor

"provide[d] an independent assessment of VW's compliance efforts" in the

course of carrying out his duties under the Plea Agreement means that the

Monitor was not an "objective proxy for the agency," as Plaintiffs argue.  (*See*

Pl. Supp. Br. 2).  Thus, the Court turns to the relevant guidance on the scope

of the consultant corollary: the Supreme Court's decision in *Klamath*,

subsequent Second Circuit cases to address the issue, and later decisions by

sister courts in this District on the scope of the consultant corollary.

In *Klamath*, the Supreme Court explained that the typical example of

consultants to whom the corollary applies

> have not been communicating with the Government in
> their own interest or on behalf of any person or group
> whose interests might be affected by the Government
> action addressed by the consultant.  In that regard,
> consultants may be enough like the agency's own

---

[17]    The *Intellectual Property Watch* court said, in full: "the law in this Circuit is unsettled as to whether an outside consultant, not acting as pure objective proxy for the agency *but rather advising expressly as an interested party meant to advocate for its own interests*, qualifies for protection under the consultant corollary."  134 F. Supp. 3d at 748 (emphasis added) (citing *Klamath*, 532 U.S. at 10-11).  Thus, the Court believes that a better reading of the dicta cited by Plaintiffs is that at one extreme, the corollary applies where the consultant is "acting as pure objective proxy for the agency," and at the other extreme, it does not apply where the consultant is "advising expressly as an interested party meant to advocate for its own interests."  *Id.*  However, the *Intellectual Property Watch* court's particular characterization of the scope of the consultant corollary does not address consultants whose role falls between these two extremes.

> personnel to justify calling their communications "intra-agency."

532 U.S. at 12.  And although the Supreme Court noted that the D.C. Circuit's formulation of the consultant corollary may arguably "extend beyond what we have characterized as the typical examples" of the corollary, it declined to define its outer limit.  *Id.* at 12 n.4.  However, the Supreme Court observed that, whatever its limit, the consultant corollary "excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants."  *Id.*

Absent the appointment of a Monitor, DOJ would be "investigating and prosecuting violations of United States law," including VW's violations.  (1st Blackwell Decl. ¶ 21).  While the Monitor does not investigate and prosecute, his service is deeply intertwined with this process, as he "ensur[es] that the company will implement a truly effective compliance program that significantly reduces the likelihood of recidivism."  (*Id.* at ¶ 13).  Thus, the Court believes that because the Monitor consults closely with DOJ in enforcing the Plea Agreement by "assess[ing] and monitor[ing] the company's implementation of its responsibilities under the [A]greement" (*see id.* at ¶¶ 11-13), the Monitor is "enough like the agency's own personnel to justify" the application of Exemption 5.  *Klamath*, 532 U.S. at 12.  (*See also* 2d Blackwell Decl. ¶ 9 ("[T]he Monitor's role was to review and assess VW's compliance and controls systems, as required by the Plea Agreement, which assisted the DOJ in determining whether VW had met its obligations under the Plea Agreement.")).

44

Seeking to distinguish *Klamath*, Plaintiffs assert that the Monitor is an "interested party," noting that VW pays the Monitor and selectively citing news articles to assert that the Monitor is not independent, but is instead an advocate for VW. (Pl. Br. 17-18). These efforts at distinction fail. *First*, although VW does pay the Monitor's salary, that is one of VW's obligations under the Plea Agreement, and failure to abide by it would constitute a breach of the Plea Agreement. (*See* Plea Agreement ¶¶ 9, 15). *Second*, DOJ — not VW — selected the Monitor. (*See id.* at ¶ 15; 2d Blackwell Decl. ¶ 9). *Third*, as Defendant explains, the Plea Agreement was constructed to maintain the Monitor's independence and objectivity. (*See, e.g.*, 2d Blackwell Decl. ¶¶ 8-10). For example, DOJ had the "sole discretion" to, *inter alia*: (i) choose from candidates VW identified or to reject all such candidates, (ii) release the Monitor if it found his work unsatisfactory, (iii) determine if VW has failed to perform its obligations under the Plea Agreement, and (iv) extend the monitorship for up to one year. (*See* Plea Agreement ¶¶ 5, 15).[18] Additionally, as the Plea Agreement establishes and as *100Reporters I* articulated persuasively, the Monitor's interests do not lie with the monitored company; they instead lie in ensuring the company complies with the terms of the

---

[18]    Plaintiffs argue that "VW had total authority over proposing candidates for the [m]onitorship," and that "[h]ad the Government disagreed with VW's proposed candidates, nothing in the Plea Agreement would have empowered it to select its own Monitor." (Pl. Supp. Br. 5). However, Plaintiffs mischaracterize the Plea Agreement's provisions regarding DOJ's power to reject VW's proposed candidates. Indeed, the Plea Agreement explicitly contemplates a situation in which DOJ disagrees with all three of VW's proposed candidates, and provides that "if the [DOJ], in [its] sole discretion, [is] not satisfied with the candidates proposed, the [DOJ] reserve[s] the right to seek additional nominations from [VW]." (Plea Agreement ¶ 15.A).

settlement and Plea Agreement.  (*See* Plea Agreement, Ex. 3 at ¶ 2).  *See also 100Reporters I*, 248 F. Supp. 3d at 149 (explaining that "the formal arrangements, including payment and the structure of the agreement to provide information, are not dispositive," and holding that "[b]ecause the Monitor was exercising independent judgment, not advocating on its behalf or on behalf of Siemens, the Court finds that the consultant corollary applies").

Drawing on *Klamath*, courts in this Circuit have looked to whether, *inter alia*, the third party "functioned 'enough like' [the agency's] own personnel"; "worked side-by-side" with the agency to address the same "fundamental concern"; or were "on the same team."  *Fox News Network, LLC* v. *U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 540 (S.D.N.Y. 2010) (quoting *Klamath*, 532 U.S. at 12); *see also Intell. Prop. Watch*, 134 F. Supp. 3d at 748.  Here, the Monitor and DOJ worked "side-by-side" to address the same "fundamental concern": VW's compliance with the Plea Agreement and efforts to remediate its environmental compliance programs.  (*See, e.g.*, Plea Agreement, Ex. 3 at ¶ 2; *see also* 2d Blackwell Decl. ¶¶ 10-21).

The cases that Plaintiffs cite to support their argument that the consultant corollary does not apply are easily distinguishable.  For example, in *Tigue* v. *United States Department of Justice*, the Second Circuit addressed the question of whether the consultant corollary applies when an outside consultant to an agency receives information from a second agency for use by that consultant in making recommendations to the first agency.  312 F.3d at 77-79.  In answering this question in the affirmative and upholding the

46

application of the consultant corollary, the Second Circuit did not consider whether the consultant corollary required the application of the proxy test. *Id.* at 79. Instead, the *Tigue* court cited with approval *Ryan* v. *Department of Justice*, the leading case for the D.C. Circuit's broad interpretation of the consultant corollary, *id.* at 77-78 (citing *Ryan* v. *Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)), and noted only that after *Klamath*, the consultant corollary was inappropriate when the consultant acts as "an interested party," *id.* at 78 n.2 (citing *Klamath*, 532 U.S. at 12).

In *Fox News Network,* the district court analyzed the Supreme Court's decision in *Klamath* to determine that the consultant corollary applied where the third party "functioned 'enough like' [the agency's] own personnel" to "'justify calling their communications intra-agency.'" 739 F. Supp. 2d at 540 (quoting *Klamath*, 532 U.S. at 12). *Fox News Network* involved, as relevant here, documents created by the New York Federal Reserve Board (the "NYFRB") and consultants hired by the NYFRB to advise the NYFRB and the Department of the Treasury ("Treasury") in relation to the financial collapse of several major financial entities. *Id.* at 530. In holding that the consultant corollary applied, the district court noted that the consultants "worked side-by-side" with Treasury in developing the disputed documents; that the consultants and agency had the same "fundamental concern" of "stabilizing the economy"; and that they were "clearly on the same team[.]" *Id.* at 540. So too here, as the Monitor and Defendant worked together towards the same goal of ensuring VW's compliance with the Plea Agreement.

47

In *Intellectual Property Watch*, the case on which Plaintiffs rely most heavily, the court declined to apply the consultant corollary because it found that the documents at issue were produced by industry advocacy groups, which "are *by definition* interested parties who are expressly meant to advocate their own interests."  134 F. Supp. 3d at 748.  Thus, the documents were exactly the sorts of "communications to or from an interested party seeking a Government benefit at the expense of other applicants" that the Supreme Court has held to fall outside the corollary.  *Klamath*, 532 U.S. at 12 n.4.  Here, by contrast, VW's Monitor is clearly not an interested party within the meaning of *Klamath*, as explained above.

And in *Welby, Brady & Greenblatt, LLP* v. *U.S. Department of Health*, the Department of Health & Human Services ("HHS") communicated with a municipal agency in an effort to prevent that municipal agency from using federal funds to satisfy a judgment.  In such a situation, the district court said, the municipal agency was not functioning "as an arm" of HHS, and declined to expand the corollary beyond the scope of its "typical" application as articulated in *Klamath*.  No. 15 Civ. 195 (NSR), 2016 WL 1718263, at *7 (S.D.N.Y. Apr. 27, 2016).  Here, as discussed above, the Monitor did not act beyond the typical role as articulated in *Klamath*.  Nor was the Monitor "communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action[.]"  *Klamath*, 532 U.S. at 12.

Under *Klamath*, Defendant has established that the Monitor: (i) acted "enough like the agency's own personnel to justify calling their communications 'intra-agency,'" 532 U.S. at 12; and (ii) was not an "interested party seeking a Government benefit at the expense of other applicants," *id.* at 12 n.4.  Plaintiffs' proffered cases do not undermine this conclusion.  The Court thus find that the consultant corollary applies to the Monitor's Report.

### ii.    The Report Contains Predecisional and Deliberative Information

Defendant explains that it used the Report in deliberations about several major decisions, as well as a series of subsidiary and related sub-decisions. (*See* Def. Br. 16-18; Def. Supp. Br. 7-8; 2d Blackwell Decl. ¶¶ 14-21).  Plaintiffs argue that Defendant's description of the decision or policy to which the Report contributed is overbroad (*see* Pl. Br. 14-18; Pl. Reply 7; Pl. Supp. Br. 5-6), and specifically that Defendant's assertion that the Report was used by Defendant to "'assess[] VW's compliance with its obligations under the Plea Agreement'" is insufficiently specific (*see* Pl. Reply 7 (quoting Def. Reply 6)).  Citing *100Reporters I*, Plaintiffs contend that Defendant "has failed to point to subsidiary decisions that fall underneath the nebulous umbrella process it has purported to identify," and that acknowledging the application of the privilege with respect to such a broad decision "would create a [multi-]year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions."  (*Id.* (internal quotation marks omitted) (alteration in original) (quoting *100Reporters I*, 248 F. Supp. 3d at 152-53)).

While Defendant's initial submissions might have been insufficiently specific as to the precise decisions DOJ made in consultation with the Report, Defendant's supplemental submission provides additional detail.  For example, the Supplemental Blackwell Declaration provides a detailed articulation of the various decisions and sub-decisions that Defendant used the Report to make, including:

    i.    whether VW was meeting its obligations under the Plea Agreement;

    ii.    whether VW was on track to complete its obligations under the Plea Agreement within the requisite time frame;

    iii.    whether VW was enhancing its compliance program and internal controls in a manner tailored to address the past violations;

    iv.    whether the Monitor was adequately discharging his duties;

    v.    how to adjust the direction and progress of the monitorship;

    vi.    whether and how to take steps to address any concerns with VW's progress and/or the Monitor's work;

    vii.    whether VW was taking its obligations under the monitorship seriously,

    viii.    whether VW deploying sufficient resources to work with the Monitor, and

    ix.    whether VW had committed subsequent wrongdoing during the course of the first year of the monitorship.

(*See* 2d Blackwell Decl. ¶¶ 13-21).  Furthermore, the Supplemental Blackwell Declaration provides a chronology of Defendant's consultation of the Report in

relation to these specific decisions.  (*Id.*).  These showings are sufficient for the

Court to "'to pinpoint an agency decision or policy to which the document

contributed,' or was intended to contribute."  *Heartland All. for Human Needs*,

291 F. Supp. 3d at 79 (quoting *Senate of the Commonwealth of P.R.*, 823 F.2d

at 585).  These showings are also sufficient for the Court to determine that at

least some portions of the Report "'reflect[] the give-and-take of the consultative

process.'"  *Judicial Watch, Inc.* v. *Food & Drug Admin.*, 449 F.3d at 151 (quoting

*Coastal States Gas Corp.*, 617 F.2d at 866).[19]

### iii.    The Court Orders *In Camera* Review

The deliberative process privilege does not, "as a general matter, cover

'purely factual' material."  *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (quoting

*Hopkins*, 929 F.2d at 85).  Thus, "memoranda consisting only of compiled

factual material or purely factual material contained in deliberative memoranda

and severable from its context w[ill] generally be available for discovery[.]"

*Envtl. Prot. Agency* v. *Mink*, 410 U.S. 73, 87-88 (1973); *see also Grand Cent.*

*P'ship, Inc.*, 166 F.3d at 482.  Plaintiffs argue that even if the deliberative

---

[19]    Plaintiffs also argue that the Report is not deliberative because it makes
"recommendations that VW, not the agency, is required to 'adopt and implement[.]'"
(Pl. Br. 15 (quoting Plea Agreement, Ex. 3)).  However, contrary to Plaintiffs' assertion,
the Report does "bear[ ] on the openness of discussions among agency employees about
the formulation of any government policy."  (*Id.*).  Defendant has submitted a
sufficiently detailed declaration explaining how decisionmakers at DOJ consulted the
Report to make a series of decisions regarding, *inter alia*, the monitorship, VW's
performance under the monitorship, and VW's compliance with the Plea Agreement.
(*See* 2d Blackwell Decl. ¶¶ 13-21).  Defendant has also demonstrated that one major
purpose of the Report was to be used by DOJ in making the aforementioned decisions.
(*See id.* at ¶¶ 9, 11).  Thus, although Plaintiffs are correct that the Plea Agreement
requires the Monitor to make recommendations to VW, it does not follow that the
Report is not deliberative.

51

process privilege applies, Defendant has failed to establish that all segregable factual material has been released, and requests *in camera* review.  (*See* Pl. Br. 18; Pl. Supp. Br. 5-6, 11-12).  Defendant rejoins that it has released all "'purely factual material' from the Report," except where, as relevant, DOJ "determined that the 'factual information' was so 'intertwined with deliberative policy discussions' that disclosure of factual portions would show the government's 'protected deliberations.'"  (Def. Supp. Br. 15 (quoting *Color of Change* v. *U.S. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018); *see also* 2d Blackwell Decl. ¶¶ 33-36 (discussing segregability analysis)).  After a careful review of the Redacted Report and Defendant's submissions, the Court agrees that Defendant's redactions are likely overbroad, and therefore orders *in camera* review.

The Supplemental Blackwell Declaration details Defendant's "line-by-line review" of the Report as part of a segregability analysis.  (2d Blackwell Decl. ¶ 33).  Defendant has withheld a significant amount of purely factual information because it claims that the factual information is "intertwined" with deliberative material.  (*See id.* at ¶ 36).  For example, Defendant has withheld large swaths of the Report, much of which appears to simply describe the Monitor's activities or VW's compliance programs or remedial actions.  (*See generally* Redacted Report).  While the Monitor's recommendations are certainly protected from disclosure pursuant to Exemption 5, the Court's careful review of the Redacted Report suggests that the Monitor's recommendations are not so closely intertwined with purely factual information to justify such extensive

withholding.  (*See, e.g.*, *id.* at 32-90, 100-21; *id.* at Appendix C-D).  The evidence in the record suggests that Defendant's withholding is overbroad, and accordingly the Court exercises its discretion to order *in camera* review.  *See Hopkins*, 929 F.2d at 85-86.[20]

\* \* \*

In light of Defendant's extensive withholdings in this case and the Court's denial of summary judgment for either side with regard to Exemption 4 and Exemption 5, the Court will exercise its discretion to require the production of the Report for *in camera* review.  *See Hopkins*, 929 F.2d at 85-86; *see also Horowitz* v. *Peace Corps*, 428 F.3d 271, 282 (D.C. Cir. 2005) (noting

---

[20]  To the extent the Report contains predecisional, deliberative material, the Court is satisfied that Defendant has "'explain[ed] how a particular Exemption 5 withholding would harm the agency's deliberative process'" under the FIA's "'foreseeable harm standard.'"  *Nat. Res. Def. Council* v. *Envtl. Prot. Agency*, No. 17 Civ. 5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (quoting *Rosenberg* v. *U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)).  The Court credits Defendant's argument that the release of the deliberative portions of the report will "risk significant harm to the Government's ability to reach careful and informed decisions about matters such as whether companies are on track to satisfy their obligations under plea agreements and, if not, what steps the Government can take[.]"  (2d Blackwell Decl. ¶ 31).  As Defendant explains, "[t]he practical purpose of monitorships, including a monitor's analysis that assists the DOJ in evaluating a company's adherence to key terms of a plea agreement, thus depends ... on the expectation of confidentiality by companies, monitors, and the DOJ to communicate openly and honestly[.]"  (*Id.* at ¶ 32).  Defendant argues that disclosure of deliberative material might threaten the government's ability to obtain from the Monitor "similarly useful analysis in the future."  (*Id.* at ¶ 31).  Similarly, disclosure of the deliberative portions of the Report would "would jeopardize the success of monitorships and thus risk depriving the DOJ of an important tool[.]"  (*Id.* at ¶ 32).

Because the Court finds that these assertions satisfy the FIA's foreseeable harm standard, it need not address Defendant's less persuasive argument that the very act of disclosing *factual information* in an independent monitor's report will cause foreseeable harm to interests protected by Exemption 5 by decreasing the quality of information — not analysis — provided to the government by an independent monitor, and accordingly, will discourage the agency's use of independent monitors in the future.  (*See* 2d Blackwell Decl. ¶¶ 28-30).  The Court is wary that endorsing such a position might authorize overbroad withholding of all factual information in an independent monitor's report pursuant to Exemption 5, regardless of whether that information is deliberative.

that "whether to conduct an *in camera* review of a document is within the trial court's 'broad discretion'" (quoting *Spirko* v. *U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998))).  Defendant is directed to provide an unredacted copy of the Report for *in camera* review within 30 days of the date of this Order.  Along with the Report, Defendant shall provide the Court with a legend to explain how the Court is to evaluate and distinguish among multiple, potentially overlapping exemptions claimed by Defendant.

## CONCLUSION

For the reasons stated in this Opinion, Defendant's motion for summary judgment is DENIED, Intervenor's motion for summary judgment is DENIED, and Plaintiffs' cross-motion for summary judgment is also DENIED.  Defendant is directed to produce a copy of the Report and an accompanying legend for *in camera* review within 30 days of the date of this Order.  The Clerk of Court is directed to terminate the motions pending at docket entries 26, 30, and 34.

SO ORDERED.

Dated:      February 3, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

54